AUTOPIANO CO. v. AMERICAN PLAYER ACTION CO.

(Circuit Court of Appeals, Second Circuit. February 9, 1915.)

No. 118.

1. PATENTS &⪰328—VALIDITY—NOTE SHEET GUIDE FOR SELF-PLAYING PIANOS.
    The O'Connor reissue patent, No. 13,398 (original No. 789,053), for a perforated note sheet guide for player pianos, covers a pioneer invention, and is entitled to a liberal construction and a broad range of equivalents.

2. PATENTS &⪰134—REISSUES—CONSTRUCTION OF STATUTE.
    Rev. St. § 4916 (Comp. St. 1913, § 9461), authorizing reissue of a patent when error has arisen "through inadvertence, accident or mistake, and without fraud or deceptive intention," is intended for relief of meritorious inventors who are likely to lose their invention through some accident or mistake, and when no intervening rights appear should be literally construed.

    [Ed. Note.—For other cases, see Patents, Cent. Dig. § 197; Dec. Dig.
    &⪰134.]

3. PATENTS ⚭146—REISSUE—REINSTATEMENT OF ORIGINAL CLAIMS IN SEC-
   OND REISSUE—INFRINGEMENT.

    A claim of an original patent may be reinstated in a second reissue, al-
though omitted from a first reissue; but in such case one who com-
menced the manufacture and sale of a device when the first reissue was
in force cannot be held an infringer of such claims in the second reissue.

    [Ed. Note.—For other cases, see Patents, Cent. Dig. §§ 218, 219; Dec.
Dig. ⚭146.]

Appeal from the District Court of the United States for the South-
ern District of New York.

This cause comes here upon appeal from a decree of the District
Court, Southern District of New York, dismissing the bill in a suit for
infringement of patent. The patent is reissue No. 13,398, granted to
complainant April 2, 1912, for an invention made by James O'Connor
on a "perforated note sheet guide." The original patent, No. 789,053,
dated May 2, 1905, was before this court in Autopiano Co. v. Am-
phion Piano Co., 186 Fed. 159, 108 C. C. A. 291. We sustained a de-
cision of Judge Hand, which held the original patent valid, but not
infringed by the device then before the court.

L. W. Southgate, of New York City, for appellant.
D. A. Usina, of New York City, for appellee.

Before LACOMBE, COXE, and WARD, Circuit Judges.

LACOMBE, Circuit Judge. [1] The opinions of Judge Hand and
Judge Mayer [1] set forth in detail the device of the patent and may be
referred to. The apparatus of the patent relates to self-playing pianos,
in which the keys are put in action by drawing a perforated note sheet
transversely over a tracker bar which contains a series of apertures,
each communicating by a tube to the pneumatic device for operating
the corresponding striker of the note. As the perforations uncover the
apertures in sequence the proper actions are successively struck in order
to render the musical composition. It is of supreme importance that
the note sheet register always with the tracker bar, so that each per-
foration will come only over the particular aperture for which it is
cut. There is a tendency in playing a long piece for the note sheet
to shift sideways over the tracker bar; a tendency which must be at
once overcome. This is a very delicate operation, involving the attain-
ment of accuracy in order to be commercially successful. Restoration
of register may be effected, either by shifting the note sheet back to
its old position, or by shifting the tracker bar to a position in proper
register with the note sheet. The patent discloses and describes both
methods.

The invention of O'Connor was a highly meritorious one and broadly
new. The prior art contains nothing which should require it to be nar-
rowly construed. Judge Mayer says:

"It undoubtedly represents the first automatic adjusting device which will
maintain automatically correct lateral register between the note sheet and

---

⚭For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes
[1] See note at end of case.

the tracker bar." "Complainant and its licensee were the first to produce a successful piano player which would operate properly all the 88 actions of a piano."

The record abundantly sustains these findings. In the patent, original and reissue alike, what is shown is a device consisting of two bellows motors; each motor is operated by air rushing into it through a tube; each tube leads to an aperture in the tracker bar. When such aperture is covered by the note sheet, no air rushes in and nothing happens. When by a sidewise slip of the note sheet one of the apertures is uncovered, air enters and the bellows motor with which the aperture is connected is put in action, moving the tracker bar in one direction; such movement at once re-covering the aperture and putting that bellows motor out of commission. A shifting of the note sheet towards the other side produces similar action by the other bellows motor; one motor moving the tracker bar to the left, and the other moving it to the right. In this way a perfect register is maintained throughout the entire forward movement of the note sheet, and the note apertures always register with note perforations.

The claims here in controversy are these:

3. The combination with the marginal surface of a traveling sheet, or web, of means for guiding or restoring the web to its normal path when diverted therefrom, a tracker bar, and means contacting with the marginal surface of the web and held out of operation when the web is in its normal position, for inaugurating the operation of the guiding means.

5. The combination, with a traveling sheet or web, of a tracker bar and means, maintained in inoperative condition by the sheet when in its normal position, for restoring the normal relation of the sheet and the tracker bar when uncovered by the edge of the sheet.

8. In a web-driving apparatus, means for restoring the web and the apparatus into normal relations when deflected therefrom, consisting of rolls for guiding the web, and a tracker bar provided with an aperture adjacent to and within the normal position of the web so as to be covered thereby, and pneumatic devices, the operation of which is inaugurated by the uncovering of the aperture, for restoring the web or the tracker bar to normal position.

19. The combination, with a traveler sheet or web, of a tracker bar, and means, maintained in inoperative condition by the sheet when in its normal position, for restoring the normal relation of the sheet and the tracker bar when uncovered by the sheet.

21. The combination of a tracker bar having a series of music apertures, means for drawing a perforated note sheet forward over the tracker bar, a pneumatic control opening appurtenant to the tracker bar and arranged so that a lateral deviation of the note sheet will change its condition, a pneumatic motor connected to adjust the lateral relation between the note sheet and tracker bar, and connections between said control opening and said pneumatic motor arranged so that, when a lateral deviation of the note sheet changes the condition of the control opening, the pneumatic motor will operate to restore the normal lateral relation between the tracker bar and note sheet before the forward run of the note sheet in abnormal lateral position can produce discord.

22. The combination of the tracker bar having a series of music apertures, means for drawing a perforated note sheet forward over the tracker bar, a pneumatic guide opening appurtenant to the tracker bar and arranged so that a lateral deviation of the note sheet will uncover the same, a pneumatic motor connected to adjust the lateral relation between the note sheet and tracker bar, and connections between said guide opening the said pneumatic motor, arranged so that, when a lateral deviation of the note sheet uncovers the guide opening, the pneumatic motor will operate to restore the normal lateral rela-

tion between the tracker bar and note sheet before the forward run of the note sheet in abnormal lateral position can produce discord.

Claims 3, 5, 8, and 19 are identical with claims similarly numbered in the original patent.

The defendant uses one bellows motor, instead of two, as shown in O'Connor's description and drawings. This bellows motor is operated in one direction or the other by pneumatic action—in one direction by pneumatic pressure directly; in the other by the expansion of a spring, which has been contracted by pneumatic pressure. Defendant has one aperture only, because it has only one bellows to move, and contends that it has avoided infringement by dispensing with the second bellows and aperture.

We are satisfied that infringement is not avoided by this simple change, since the patent is a pioneer one, entitled to a liberal construction and a broad range of equivalents. If part of a combination is stated to be a square table on four legs, and neither the shape of the table nor the number of legs is a matter of any importance, so long as the table is large enough and is maintained in a horizontal position, a triangular table on three legs would be an equivalent of the element specified. The defendant's double bellows is in fact two bellows placed together and working by a combination of air pressure and spring alternately in opposite directions. The exact location of each of these bellows is not of the essence of the invention, so long as each performs its function of producing a correct register between the perforations in the note sheet and the note apertures in the tracker bar. None of the claims here relied on is limited to two bellows and two apertures, nor does anything in the prior art require that they should be so limited in order to save them. If other prior inventors had employed a double acting bellows operated through a single opening, of course O'Connor would be held strictly to his two bellows construction; but as he was a pioneer so far as this improvement is concerned—the first to restore register by moving tracker bar or note sheet by the action of bellows motors, set in motion by uncovering auxiliary apertures in the tracker bar—infringers cannot escape these claims by locating their bellows or one member of their bellows in a different place.

Defendant further seeks to avoid infringement because in its device the aperture in the tracker bar is never fully covered by the note sheet, some air is always passing in. But when the note sheet is in a normal position the small amount of air thus passing in is so neutralized by springs, etc., about the motors that its effect is nil. Whenever the aperture is by a displacement of the note sheet more widely uncovered, air which enters sets the bellows in motion to produce action in one direction. Whenever by a different displacement of the web the aperture is more fully covered, less air enters and there is a contrary action of the bellows. Defendant's device may evidence improvement, possibly even patentable improvement, in simplification of structure or saving of cost; but that will not negative infringement, when in substantially the same way substantially the same results are produced, and the prior art justifies a broad construction of the claims. Defendant's device is a plain equivalent of what is shown and claimed in the patent; its

double action bellows has substantially the same parts, acting in substantially the same way to accomplish the same results, viz., to move the tracker bar one way or the other, so as to maintain a proper register at all times between note sheet and tracker bar.

If the original patent had never been changed, or if this second reissue were the original patent, the state of the art being shown in the record before us, we are satisfied that defendant's device complained' of (Exhibit 4) is an infringement of the claims above quoted. Does its reissue history call for any different conclusion?

In the suit against the Amphion Company, supra, the defendant's device was held not to infringe. The O'Connor patent, as we have seen, automatically sets the motors in operation by uncovering an aperture in the tracker bar. The note sheet, which runs smoothly, slides off or on the aperture; the surface of the sheet is either superimposed over the aperture or is withdrawn therefrom. This is spoken of as "surface control." In the Amphion device the automatic action was the engagement of the edge of the note sheet (whenever it slipped out of register) with the end of a lever. This is spoken of as "edge control." It was held in the Amphion Case that the language of the specifications and claims precluded a construction which would cover a device operating automatically under "edge control."

The owner of the patent—O'Connor had sold and assigned it to complainant—was dissatisfied with this result and consulted a lawyer who had not theretofore had anything to do with the case. He recommended applying for a reissue, modifying the language of the patent so as to cover "edge control," and prepared the papers and made the application. Apparently he formed the impression that the prior art was such that the claims of the original patent were too broad. In the proposed reissue patent he struck them all out, and substituted four claims, each of which was restricted to "two bellows motors" and "two guide openings." The proposed reissue also contained seven specific disclaimers, none of which affected the number of bellows motors or apertures. This reissue, as asked for, was granted August 15, 1911; it was applied for April 1, 1911, less than a month after final decision in the Amphion Case.

After this reissue was received by the owner of the patent, it realized that a very serious change had been made from the original patent. It took the matter up with counsel, other than the one who had obtained the first reissue and in December of the same year applied for a second reissue, pointing out that the error of the first reissue was:

"That the specification thereof is not sufficient, and that said insufficiency consists particularly in the omission to include in said reissue patent the claims appearing in applicant's original letters patent No. 789,053, dated May 2, 1905, and in the omission to claim a combination substantially the same as the claims of said first reissue, but covering only a single guide opening, as particularized in a large number of the claims of said original patent."

No change was sought to be made in the descriptive part of the specification of the first reissue, which set forth two bellows motors and two apertures, as indeed the original description did. The proposed second reissue contained the original claims, which had been

dropped in the first reissue. These include 3, 5, 8, and 19, supra. Some additional claims were added, among which are 21 and 22, supra. The application was made in the usual form, accompanied by oath that:

"The errors which render said prior reissue patent so inoperative arose from inadvertence, accident, or mistake, and without any fraudulent or deceptive intention on the part of deponent."

[2] The second reissue was granted as prayed April 2, 1912. The statute (Rev. St. § 4916 [Comp. St. 1913, § 9461]), authorizing reissue when error has arisen "through inadvertence, accident, or mistake, and without fraud or deceptive intention," is undoubtedly intended for relief of meritorious inventors who are likely to lose their invention through some accident or mistake. When no intervening rights appear, it should be and has repeatedly been liberally construed. It may be noted that we have not here the situation presented in some of the authorities, where the reissue contains a claim which, after controversy with the Patent Office pending his earlier application, the inventor abandoned, acquiescing in its rejection.

[3] Every one of these claims 3, 5, 8, and 19 was allowed by the Patent Office, and the only "abandonment" of them relied upon is their omission from the first reissue. Defendant's position seems to be that there never can be a reissue of a claim once allowed in the original and omitted from a first reissue; but to this proposition we do not assent. Giant Powder Co. v. Safety Nitro Powder Co. (C. C.) 19 Fed. 510; Celluloid Manufacturing Co. v. Zylonite Brush & Comb Co. (C. C.) 27 Fed. 293; Sawyer Spindle Co. v. Eureka Co. (C. C.) 33 Fed. 836. It may be noted, also, that the claims here are not broader than the original claims, as they were in many of the cases cited on the argument. Inasmuch as the statute provides for "inadvertence, accident, or mistake," not, as defendant paraphrases it, "mistake inadvertently committed," there is no reason why the mistake should not be corrected even though it occurred in an attempt to amend.

The first reissue was certainly not obtained by "inadvertence." It was the result of the deliberate attempt of a patent solicitor to modify an existing patent; but it was, so far as we can see, none the less a mistake, and not merely a mistake of judgment, as when applicant's solicitor submits to rejections by the Patent Office. The mistake was as to what the prior art contained. It was believed to be much more extensive than the patentee supposed it to be when he applied for his original patent, so broad that his claims could not be sustained unless they were strictly confined to two bellows motors and two apertures. But, now that the prior art is displayed, it is apparent that it is not so broad as the owner of the patent and his solicitor supposed it was when application was made for the first reissue. When this misconception as to condition of the prior art was discovered, application was promptly made for a second reissue, and the affidavit on which such application was based truthfully stated—at least, there is nothing shown to negative its truthfulness—that the omission from the first reissue of the original claims was a "mistake." That there was "any fraudulent or deceptive intention" we find no evidence at all.

Before the second reissue was granted, however, and while the public was advised that the rights which complainant claimed were those only announced to the public in the first reissue, defendant began the manufacture of player piano actions with automatic regulation of the register between note sheet and tracker bar. It used the fundamental idea of O'Connor, viz., moving the tracker bar to one side or the other, so as to keep its apertures in register with the note sheet perforations, effecting this motion by the operation of a bellows motor, setting the motor in operation by the admission of air to it through an auxiliary aperture in the tracker bar, and automatically regulating the initiation of such motion by means of the note sheet moving over the auxiliary aperture. The defendant's device, however, consisted of a single bellows motor, moved one way or the other as it was exposed to pressure or suction. This device (Exhibit N), was not covered by the first reissue, the claims of which were confined to two motors and apertures. That defendant entered upon the manufacture and sale of these automatic trackers before the grant of the second reissue made public the fact that complainant was making claim to the broad invention covered by the claims here in issue is fully established. That only five of these player piano actions were actually sold is immaterial. Not only the five are free from this reissue, but the business of manufacturing and selling automatic trackers of the type shown in Exhibit N, which was entered into in the belief, warranted by complainant's conduct and mistakes, that defendant's tracker would not be challenged as an infringement under either the original patent, which had been given up, or the reissue, which did not cover it, cannot be interfered with under this second reissue.

The defendant is now making and selling a modification of this Exhibit N, which is known as Exhibit 4. In its original double acting bellows motor the air which came through the auxiliary aperture impinges upon a diaphragm which raised or lowered a stem carrying two valves, the movements of which brought to the bellows motor alternatively "pressure air" or "suction air." In the present type the diaphragm, stem, and valves are discarded, and the air from the aperture is brought directly to the inside of the bellows motor; connection between the bellows motor and the air chest being regulated by a small disk having a so-called ·bleed opening therethrough. The improvement simplifies structure, presumably costs less, and is said to be more efficient, operating more quickly. We do not see, however, that it has so changed the type shown in Exhibit N as to make it no longer free from the claims of the second reissue.

We therefore reach the conclusion that complainant is estopped from claiming infringement by this particular defendant in continuing the manufacture and sale which it entered upon while the first reissue was the only public announcement of complainant's alleged monopoly.

The decree is affirmed, with costs.

WARD, Circuit Judge (concurring). I think the decree dismissing the bill should be affirmed, on the ground that the complainant, by taking the first reissue with the four narrow claims, abandoned the

broad claims of the original patent, which should not have been restored to him by the second reissue. The cases cited in the opinion of the court upon this point involve reissues with broader claims than those of the original patent. When in such a reissue the narrow claims are repeated or where they are covered by the broader claims, it is reasonable to restore them to the patentee on his surrendering the reissue. There is in such case no evidence of an intent to abandon narrower by asking for broader claims. Where, however, the patentee withdraws broad and asks for narrow claims, there can be no other inference than that of an intention to abandon the broad claims. If this is done because of accident, inadvertence, or mistake, the statute no doubt permits relief. Here, however, no claim is made of accident or inadvertence, but only of mistake as to the prior art. The mistake was that of the attorney, who withdrew the broad and obtained the narrow claims of the first reissue. It was evidently the result of a misconstruction of the prior art, a mistake of law, which I think not remediable under the statute. If there were any mistake of fact, the complainant, upon whom the burden of proof lay, should have called the attorney who made the mistake to state exactly what it was and how it arose.

NOTE.—The following is the opinion of the District Court:

MAYER, District Judge. The patent in suit is a second reissue. The original patent contained 20 claims, the first reissue 4 claims, and the second reissue the 20 claims of the original patent restored thereto, and the 4 claims of the first reissue, and 3 new claims. The claims here in controversy, which were incorporated in the original patent, are Nos. 5, 8, 10, 16, 19, and 20. Claims 21 and 22 are new claims, and the 4 claims of the first reissue are not involved in this suit.

The defenses are (1) that the reissue patent is void "for fraud, deception, and failure to comply with statutory requirements"; and (2) that there is no infringement. Player pianos have gone into extensive use, and their sales in the United States now amount to millions of dollars per annum. The original patent was granted to O'Connor on May 2, 1905, he stating: "This invention relates to means for guiding a traveling sheet or web in suitable relation to or registration with the rolls, type, tracker bar, or other devices of machinery or apparatus employing such a sheet or web, the object being to maintain the sheet or web in suitable normal operative relation to its associated devices by means of the margins of the sheet or web itself without any perforation or cutting or other special preparation of the sheet and without in any way injuring the edges of the most delicate or fragile fabric."

What O'Connor sought to accomplish was the automatic regulation of the note sheet, so that the perforations therein should register correctly laterally or sidewise with the apertures in what is known as the tracker bar. In the self-playing pianos there is incorporated an automatic playing mechanism arranged so that the piano can be played automatically or manually from the ordinary keys. The pianos are operated by air, a pneumatically operated striker being provided for each action of the piano. To actuate these strikers a perforated note sheet is drawn over an apertured tracker bar. Most of us by this time are familiar with the way in which the note sheet is wound on a spool or music roll before being placed in the instrument and is drawn therefrom over the tracker bar by being wound up on a drawing roll which is rotated by suitable propelling means. The note sheet has a series of perforations corresponding in arrangement and spacing to the notes of the piece of music which is to be played. The tracker bar has a series of apertures corresponding in number to the actions to be operated, each aperture communicating by a tube to the pneumatic for actuating the corresponding striker of

the action. As the perforated note sheet is drawn over the tracker bar, the perforations in the note sheet uncover the apertures in the tracker bar in sequence, so that the proper actions are successively struck in order to render the musical composition for which the sheet is cut. The tempo is governed by the speed with which the note sheet is drawn over the tracker bar and means are provided whereby the operator may regulate such speed. The result is that the sheet may run over the tracker bar at anywhere from a very slow to a very rapid rate. The failure of the note sheet, at any time during its entire run, to register laterally with the tracker bar, so that the perforations in the sheet will correctly cover and uncover only the proper apertures in the tracker bar, obviously will result in discord.

The ordinary piano has 88 keys, and previous to the O'Connor invention there were not any commercially successful player pianos which would operate more than 65 out of 88 actions of the piano. The reason for this limitation was that, with 65 notes, the apertures in the tracker bar could be spaced six to the inch, leaving bridges between the apertures of about one-sixteenth of an inch in width, so that a slight deviation of the note sheet from its true path would not produce discord; but where 88 notes were employed, it was necessary to space the apertures nine to the inch, whereby the bridges between the apertures were only about one-fiftieth of an inch in width, and hence a very slight deviation of the note sheet would produce discord. It will be seen, therefore, that the subject-matter related to a very delicate operation involving the attainment of accuracy in order to be useful and thereby commercially successful.

The O'Connor patent undoubtedly represents the first automatic adjusting device which will maintain automatically correct lateral register between the note sheet and the tracker bar, and it is nowhere denied that complainant and the Amphion Piano Player Company (O'Connor's licensee) were the first to produce a successful player piano which would operate properly all the 88 actions of a piano. O'Connor, however, evidently had a hard task convincing manufacturers of the value of his invention, and it was not until he gave his license to the Amphion Piano Player Company that he seems to have made any impression. The Amphion Company placed the device of the O'Connor patent on the market on April 4, 1908, and on October, 7, 1908, O'Connor sold the patent to complainant. After this purchase complainant discovered to its surprise that the Amphion Company was manufacturing a player piano containing O'Connor's device, and was justifying its manufacture under the claim of a license obtained from O'Connor, prior to the assignment of the patent to complainant. Complainant brought suit against the Amphion Company, its bill having been verified on January 27, 1909. In that suit two forms of instrument, known in that case as "Complainant's Exhibit No. 3" and "Complainant's Exhibit No. 4," were involved. The cause came on before Judge Hand, and was decided by him on November 22, 1910, in a comprehensive opinion, and the decree entered thereon was affirmed, without opinion, by the Court of Appeals for the Second Circuit, on March 15, 1911.

Judge Hand held the patent valid and that Exhibit 3 was a precise copy of the patent and a clear infringement, but that this exhibit came under the license. He also held that Exhibit 4 was not infringed. While Judge Hand thought that the invention was not a pioneer, he expressed the view that it was "a meritorious and excellent invention." His judgment in this regard was not only affirmed by the appellate court, but has since been justified by the remarkable commercial success of the device.

In 1913 complainant manufactured and sold 8,643 player pianos, and two licensee companies made and sold 39,000 of these player actions for other piano manufacturers. Nearly one-half of the automatic mechanism of the player pianos manufactured in the United States in 1913 were produced by complainant, or its licensee company, and it is estimated that, on an average price, the manufacture of over $20,000,000 worth of player pianos was rendered possible by other piano manufacturers by reason of the O'Connor automatic tracker. Whatever the figures may be, it is enough to say that they run into some millions of dollars, and that complainant company, which in 1908 was a relatively small concern, is to-day the largest, or one of the largest, manu-

facturers of player pianos in the world, and that it, with its two licensee companies, employs over 1,400 employés, with a weekly pay roll of over $16,000. Such a result cannot be accomplished merely by able business methods, but, in substantial part, must be because of the production of an instrument which the public desires.

While the patent may not be a pioneer, I am satisfied that, in a sense, it has helped revolutionize the business of manufacturing and selling moderate priced self-players, on easy terms, and the men who developed the O'Connor patent, and had the good judgment and courage to exploit it, should not lightly be deprived of the just fruits of their labors. Up to the time of the suit before Judge Hand, there was nothing to suggest to the inventor, or his assignee, the necessity of making any changes in his claims; but the result of that suit manifestly created alarm, and thereupon, instead of continuing the employment of their then attorney, who was thoroughly competent and evidently had lived with the case, complainant retained another attorney. Application for a reissue was advised, and was filed on April 1, 1911—only 16 days after the decision of the Court of Appeals. An affidavit was prepared for and sworn to by O'Connor, wherein, among other things, he stated that the original letters patent were invalid by reason of his claiming as invention more than he had the right to claim, "and that the combinations thus excessively claimed, are the combinations which are claimed in claims 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 14, 17, 18, and 19, and that the combinations claimed in claims 13, 15, 16, and 20, respectively, are therein claimed too broadly, in that they are not limited in certain respects, in which they *must be limited* in order to make them respectively conform to the new and useful inventions which they were intended to define." O'Connor's affidavit continued: "Neither the deponent nor his attorney was a professional patent lawyer (not referring to Mr. Southgate, but to a previous attorney), and their deficiencies of legal knowledge led them into the erroneous opinion that it was not necessary to limit any of the claims of said application to combinations including *two* guide openings and *two* bellows motors, and the examiner did not instruct them into the true view of the law relevant to that subject, which true view is that the law requires each claim of any proper patent upon the deponent's invention to be limited to a combination which includes a guide opening and a bellows motor to control the lateral tendency of the note sheet in each of the two directions toward which that tendency may be developed."

Seven supposed inventions were disclaimed, and in a letter dated March 29, 1911, from the attorney, accompanying the application, the following statement was made: "Sixth. The specification of the reissue application contains only 4 claims, whereas the original letters patent has 20 claims, many of which are broader than any or all of the 4 claims of the reissue application, in that each of many of the 20 claims of the patent are broad enough to cover one or more of the 7 inventions disclaimed in the reissue application, whereas none of those inventions fall within the terms of any of the 4 claims of the reissue application."

The specification of the first reissue No. 13.283 set forth: "The principle of this invention, in whatever mode it is embodied, is as follows: Correct registration between the perforations in the note sheet and the corresponding music apertures in the tracker bar is constantly maintained by two bellows motors, which work mechanically in opposite directions, but which are worked by atmospheric pressure, which pressure is constantly governed, but not produced, by the presence or absence, as the case may be, of tendency to lateral movement of the note sheet upon the tracker bar." Figures 2, 3, and 4 of the original patent were omitted, and Figure 1 was retained. That figure showed two bellows motors (*23* and *24*) and two guide openings (*29* and *30*), as did also Exhibit 3 in the Amphion suit, though arranged in a slightly different manner.

It is contended that the statement of invention in the first reissue omitted the clause of the original patent, "by means of the margins of the sheet or web itself without any perforations or cutting or other special preparation of the sheet and without in any way injuring the edges of the most delicate or fragile fabric" so as not to exclude apparatus controlled by perforations in the sheet or controlled by edges of the sheet and so as thereby to include the

construction in the Amphion case (known as Exhibit 4), which Judge Hand had held not infringed. Whatever the purpose of the change may have been, the fact is that the specification set forth in full detail two bellows motors and two guide openings and their operation, and the 4 claims were limited in unequivocal language to two bellows motors and two guide openings. On August 15, 1911, only five months after the affirmance of Judge Hand's decision, the first reissue was granted to O'Connor as assignee of complainant.

When the reissued letters patent came to the attention of the officers of complainant company, they were surprised, and they could not understand how it was that the Patent Office had allowed them but 4 claims, when they had 20 claims theretofore. Thereupon they returned to Mr. Southgate, their original counsel. He proceeded with diligence, filing the application for a second reissue on December 12, 1911 (long before complainant knew about defendant's alleged infringements), and succeeded in having the second reissue (the patent in suit) granted on April 2, 1912. The 4 claims of the first reissue are concededly narrowed claims. In the second reissue, all of the claims of the first patent, as above stated, were reinstated, together with the 4 claims of the first reissue (not here in controversy), and 3 additional claims, of which 2 are involved in this suit.

In the specification of the second reissue the principle of the invention is stated in precisely the same words as in the first reissue, and the language of the original patent, in that regard, is not readopted. Indeed, from the words "To all whom it may concern" (line 1) to "deflected therefrom" (line 129), the specifications of the first and second reissues are identical, word for word, and numeral for numeral. In the second reissue, as in the first, Figures 2, 3, and 4 of the original patent are omitted. Claims, of course, cannot be torn from their context, and whatever may have been the proper construction of the claims of the original patent, when read in connection with the context therein contained, the claims now under consideration must be read with the context of the reissued patent here in controversy.

I think I appreciate the difficulty with which Mr. Southgate was confronted, for the situation was between the upper and the nether millstone. There was danger in going back to the original specification, and to stand on the first reissue would result in a limitation which might impair, to some extent, at least, the value of the patent. But, although the application for the second reissue was made in the hope of claiming a combination "substantially the same as the claims of the first reissue, but covering only a single guide opening as particularized in a large number of the claims of the original patent," these claims, if valid, in view of the specification of the second reissue and the whole history of the proceedings, must be construed in the second reissue as limited to a construction with two bellows motors and two guide openings operating on the principle stated. As so construed, the defendant's device does not infringe claims 3, 5, 8, 10, 16, 19, and 20, as will appear later.

It will be serviceable to follow the history of the defendant, as introductory to a consideration of claims 21 and 22. Defendant company is the successor of the American Player Action Company, formerly of Davenport, Iowa, which went out of business in the spring of 1911. Defendant company started to make player piano actions with automatic trackers. One of these actions (like Defendant's Exhibit N) was shipped July 22, 1911, to Krell Piano Company, of Cincinnati—that is to say, at a date while the original patent was still in existence and before the first reissue. Another was shipped to Knabe Bros., of Norwood, Ohio (not the older house of the same name at Baltimore), on October 26, 1911, a date while the first reissue was alive; and three were shipped to the Krell Company on December 6, 1911, or about four months before the second reissue. The manufacture of these actions was abandoned in December, 1911, and there is no evidence that they were installed in pianos or sold to the public.

Devices like Complainant's Exhibit 4 (in this suit), the alleged infringing mechanism, were concededly not made until after the second reissue patent, although Turney, the inventor of Exhibit N, applied for a patent on September 22, 1911, which, however, was not granted until March 25, 1913, two months after the bill in this suit was filed. Turney frankly stated that, between the

time Exhibit N was abandoned and Exhibit 4 was placed on the market, he had read the second reissue and thoroughly understood its theory. He also stated that Exhibit N was abandoned, because Exhibit 4 cost less money to build and was more effective, although of the same principle as Exhibit N.

Between, however, 1905, the date of the original O'Connor, and December, 1911, the date of the application for the second reissue, the art had learned a good deal—notably Doman, No. 939,897, November 9, 1909, and Southgate, No. 995,492, June 20, 1911. In addition, Judge Hand's decision had pointed out the breadth and limitations, respectively, of the patent in certain respects. While Turney's patent (No. 1,056,858) was not granted until 1913, he was striving in 1911 to work out an invention along the lines of one opening or port, and had progressed far enough at least, to file his application for a patent at a time when the first reissue was alive and the application for the second reissue had not yet been filed.

One of the reasons why the courts are so strict as to reissues with broadened claims is because a loose or over-liberal construction will arrest progress, and men will have little incentive to further the art, if, after a long delay, the patentee acquires a broader invention than that which, in the first instance, he made known to the world. Claims 21 and 22 are unquestionably broadened. In claim 21 is the dragnet as to a lateral deviation changing "the condition" of the control opening. Further, all of the original patent claims positively define the relation of the guide opening to the normally positioned web. Thus, to be infringed, these guide opening means of these original claims must be either "held out of operation by the web, when the web is in its normal position," or its operation must be inaugurated "only after the web has departed from normal position, or the opening must be arranged, not merely adjacent to and within the normal position of the web," but so far within "as to be covered thereby," or "closed." In the second reissue claims 21 and 22 omit any such limitation positively defining the relationship of the guide opening to the normal web; and claim 21 especially is not limited to a normally "closed" or normally "held out of operation" guide opening.

On the question of delay, claims 21 and 22 must be considered in relation to the original patent, and, I think, are quite distinguishable in principle from the first 20 claims, in respect of which there was not unreasonable delay. Over six years had elapsed between the granting of the original patent and the application for the second reissue, and such a delay, under now settled authority, renders these two broadened claims void.

Finally, as to infringement. In view of what I have pointed out supra, the remaining claims cannot be sustained as subcombinations. So to do would really be to construe the claims as applying to one guide opening and one bellows motor, and that cannot be done if the patent is to be saved.

The only theory remaining is that of equivalency. What the range of equivalents might have been in respect of the original patent is no longer open to discussion, for we are here dealing with the second reissue. Defendant's original device is not now in issue. Defendant's improved machine has a single guide opening and a single bellows motor. There is no alternate covering and uncovering of the guide opening.

Another characteristic of defendant's machine is its continuity of operation. It never stops pressing the tracker bar in both directions until the playing is stopped. The spring is always pressing to the left and the pneumatic to the right. In defendant's device, a constant stream of atmospheric air is being sucked through the continuously open guide opening into the bellows motor to produce the pressure therein, which constantly varies with the extent, more or less, to which the traveling sheet opens the guide hole. I have not overlooked the experiment of a spring and one bellows motor, but in these particulars (and details of operation might be compared in extenso if necessary) the device of the second reissue works on a different principle, and therefore does not infringe.

I must say that I regret the result, in view of the merit of the invention; but courts must pass on what is, and not on what might or should have been.

The bill is dismissed, with costs. Settle decree before June 27, 1914.