GENERAL REFRACTORIES CO. v. ASHLAND FIRE BRICK CO.

(District Court, E. D. Kentucky. September 9, 1926.)

No. 1031.

1. Patents ⊂⇒138(2).

An intervening right never affects validity of reissue.

2. Patents ⊂⇒138(2).

Intervening right cannot be acquired, unless more than two years have elapsed from granting of original patent.

3. Patents ⊂⇒138(2).

Owner of machines infringing claim in reissue made within one year from date of original patent *held* not to have acquired any intervening right.

4. Patents ⊂⇒328.

Reissue patent, No. 15,889, for a brick machine, *held* valid and infringed.

In Equity. Suit by the General Refractories Company against the Ashland Fire Brick Company charging infringement of reissue patent, No. 15,889, for a brick machine. Decree for plaintiff.

Augustus B. Stoughton, of Philadelphia, Pa., and John M. Theobald, of Grayson, Ky., for General Refractories Co.

Winter, Brown & Critchlow, of Pittsburgh, Pa., and Prichard & Malin, of Ashland, Ky., for Ashland Fire Brick Co.

ANDREW M. J. COCHRAN, District Judge. This suit is before me upon final hearing. It is a suit for infringement. The patent involved is reissue No. 15,889 granted August 12, 1924, to plaintiff, as assignee of James R. Tackett, the inventor, on an application made July 2, 1924. The original, No. 1,460,455, was granted July 3, 1923, to Tackett on an application made September 16, 1922. The length of time between the granting of the original and the application for the reissue was one year, lacking a day.

The invention covered by the patent was a brick machine. Though it was not limited thereto, the patentee, in devising the machine, had in view the manufacture of fire brick. He was in the employ of plaintiff, whose business was that of a manufacturer and seller of fire brick. The result intended to be, and which was, successfully, accomplished thereby was the production of fire bricks of uniform size and accurate dimensions. No such bricks were then being produced. With them a better and cheaper wall could be made and they brought a 10 per cent. higher price in the market.

The reissue made no change in the original, except to add another claim. The original contained nine claims, and the added claim is numbered 10. It is an expansion of claim 3, which was in the original. Claim 3 is in these words:

"In a brick-treating machine, a brick press, a brick repress in spaced relation to each other, a brick support interposed between the presses on which bricks are transferred, pushing elements for engaging the bricks, and pushing them over the support, lifting and transferring elements coacting with the pushers for moving the bricks certain steps in their progress from one press to the other, means for operating the brick-pushing elements and brick-transferring elements oppositely, and a brick trimmer in the path of the travel of the bricks while under the influence of one of the pushing elements."

Claim 10 is in these words:

"A brick-treating machine comprising a brick press, and a brick repress, in spaced relation to each other, a brick trimmer arranged between said presses and a conveyor interposed between said presses and extending from one to the other of them and spaced beneath and clear of the trimmer."

Each of these two claims is a combination claim. Claim 3 contains seven elements and claim 10 four. Three of the elements in claim 3 are in claim 10, to wit, press, repress, and trimmer. The other four elements in claim 3, to wit, support, pushing elements, lifting and transferring elements, and means for operating these elements, oppositely, go to make up the other element in claim 10, to wit, conveyor. Together they constitute a particular kind of such conveyor.

The difference between the two claims, therefore, consists in this. The machine called for in claim 3 is made up of brick press, a brick repress, trimmer between the two presses, and a conveyor of the particular kind called for therein, whereas that called for in claim 10 is made up of a brick press, brick repress, trimmer between the two presses, and any conveyor between them and spaced beneath and clear of the trimmer that will do the work.

So it is that, as stated, claim 10 is an expansion of claim 3. Claim 3 is limited to the particular kind of conveyor called for therein. Claim 10 takes in any kind of conveyor that will do the work. The invention covered by claim 10 was clearly disclosed in the original patent. Claim 3 presupposed it and was built upon it. But it was not claimed therein. The sole object of the reissue was to claim it and thereby remedy the defect in the original.

The claim of infringement is limited by stipulation to claim 10, though it is argued on behalf of plaintiff that claim 3 is also infringed. This is on the idea that plaintiff is entitled to a broad range of equivalents and the conveyor in defendant's machine is the equivalent of that called for in claim 3.

The defendant concedes the validity of claim 3. It is useful and novel and called for an inventor's skill to conceive it. It denies infringement. Its machine contains a brick press, a brick repress, a conveyor, and a trimmer, the two latter being between the press and the repress. The denial of infringement is based on the claim that its conveyor is different from and not the equivalent of the conveyor of claim 3. Its trimmer is different from that in use by plaintiff in that it is four bladed and revolves, where-

as the latter is a single blade and is stationary. But claim 3 contains no limitation upon the trimmer as it does upon the conveyor.

Inasmuch as the claim of infringement has been limited to claim 10, it is not necessary for me to determine the matter of equivalency between defendant's conveyor and that of claim 3, and hence as to whether claim 3 is infringed I pass that question up.

Defendant presents four defenses to claim 10, to wit, what it terms that of intervening rights, want of novelty, lack of invention, and noninfringement. It stresses the defense of intervening rights and says that the case is controlled by it, and hence that it is not necessary that I pass on the other defenses. I proceed at once to a consideration of that defense.

The facts out of which it has arisen are these: The plaintiff carries on its business of manufacturing and selling fire brick at Olive Hill, in Carter county, in this district. The defendant is engaged in the same business at Ashland, in Boyd county, which adjoins Carter. The fire clay used by both comes in the main from Carter. The two, therefore, are competitors carrying on their respective businesses in close proximity to each other.

After the application for the original patent and before it was granted, Tackett sold to plaintiff the right to construct and operate a machine embodying his invention on a royalty basis. It was probably put in operation not earlier than May, 1923. The defendant did not hear of the machine and its product until after the patent was granted in the latter part of July, 1923.

Information thereof was given to it by plaintiff's superintendent, who suggested that it negotiate with Tackett for the right to use such a machine, and Tackett himself took the matter up with it. At the time, however, plaintiff had an option for the purchase of the patent which it shortly thereafter exercised, probably in the latter part of August, 1923.

The defendant was impressed with the value of the machine and eager to have one. It determined to construct and use a machine which would produce the same result, if it could do so without infringing the Tackett patent. Its assistant manager, who had been handling the negotiations with Tackett, when informed by him of the acceptance by plaintiff of its option, which shut off all further negotiations, said to Tackett several times: "I must have this machine if we can get it. I need this machine."

On September 6, 1923, defendant wrote

its general counsel for a copy of the patent and requested advice as to how to proceed to get a machine that would not infringe. It said: "We are very desirous of accomplishing the same results, but in such a manner as not to infringe on Mr. Tackett's idea." And further: "Our observation leads us to believe that if the General Refractories is to be the only one that can produce such a brick, we will suffer considerably."

Defendant's general counsel answered September 12, 1923, inclosing a copy of the patent and suggesting that it and its engineers look the patent over and then "sketch up some form of machine" which it thought "would do the work and which is differently constructed, submitting this to us for our opinion as to infringement."

During the negotiations with Tackett, defendant's assistant manager and a skilled employé had examined plaintiff's machine, and after it determined to construct and use a machine which would produce the same result withiut infringing and likely after the receipt of this letter, this employe examined it further, with a view to devising such a machine. This examination does not appear to have been made with plaintiff's consent. The result was that he devised such a machine.

On September 24, 1923, defendant submitted blue prints of this machine in three types to its counsel and requested advice as to infringement. It said: "If we have an idea here that we are at liberty to use, we want to know it as quickly as possible so that we can get started, for there will be quite a little work to be done in building the special equipment and the ordering of several of the large brick presses," etc.

October 5, 1923, they wrote, advising that the machine did not infringe in either of its types. On October 30, 1923, defendant by letter submitted to its counsel another and fourth type for advice as to whether it infringed. It requested that they "give the matter preferred attention and rush it through as much as possible." On November 2, 1923, they wrote, saying that this type did infringe. In a letter of November 5, 1923, defendant requested further consideration of the question; and in their letter of November 12, 1923, they answered adhering to their former opinion.

Thereupon defendant abandoned this type of machine, though seemingly they looked upon it as the best of the four types, and proceeded to construct a machine according to one of the other three types. The construction of this machine was completed January 1, 1924. On January 19, 1924, it ordered the material for another machine of the same type, and completed its construction May 8, 1924. Each machine was at once put in use as soon as its construction was completed.

Upon the completion of the first machine defendant began to advertise for sale and to sell the product thereof. It advertised it in seven well-known technical and trade magazines of national distribution. In its advertisement it had this to say: "Old Timers say: 'Uniform size of fire brick is far more important than the quality. If I had to choose between a high-grade, but uneven, brick and a poor grade of uniform size, I'd take the true dimension brick every time.'"

And referring to a photograph of its brick it said that it showed "the uniformity secured by means of our special trimming device (patent applied for) and double pressing. They lay up true without scotching. No need to break the hard outer surface— no space between bricks for the heat and slag to seep in and attack the brick. Just one homogeneous high-grade lining throughout."

As stated at the outset, the reissue was applied for July 2, 1924, and granted August 12, 1924. Defendant, however, was notified that the reissue would be applied for in advance of the application therefor. This was by letter of date June 5, 1924, from plaintiff's counsel. The writing thereof came about in this way. Plaintiff's counsel by letter dated May 3, 1924, received by defendant May 6, 1924, two days before the construction of the second machine was completed, charged defendant with infringement.

Defendant submitted this letter to its counsel and by letter dated May 15, 1924, they called on plaintiffs to point out wherein infringement consisted. It was in answer to this letter that plaintiff's counsel gave notice of its intention to apply for reissue. He said: "It is right and proper that I should say to you that the intention is to protect the invention of Mr. Tackett by a reissue of the patent above referred to."

Before the receipt of this notice the defendant had expended in the construction of these two machines $17,272.79 and in advertising $1,337.80 and it had sold 1,065,461 brick for $13,689.90. It continued after the receipt of this notice to advertise for sale and to sell the product of these two machines and at the time of the bringing of this suit, November 11, 1924, had expended the further sum of $1,181.65 in advertising and had sold 1,235,414 more of such brick, the sale of the entire number sold coming to $48,269.56.

Such, then, are the facts on which defendant bases the first of its four defenses, to wit, that of intervening rights. It concludes that by reason of what it did, as thus set forth, it acquired the right, not only to continue to use these two machines, but to make and to use such other like machines as it chooses, though I gather that it would be content if its right is limited to the two machines. The contention is not that the reissue is invalid. There is no room to claim that it is. It is that the reissue is not enforceable against it because of its acquisition of such right.

It bases this contention on two considerations, the original patent, by not claiming the invention disclosed by it and subsequently covered by claim 10 of the reissue, dedicated it to public use. It acted in what it thus did in reliance on such dedication. By reason thereof the plaintiff is estopped to assert such claim against the defendant. The estoppel is not based on any encouragement on the part of the patentee or Tackett to act as it did. It is based solely on Tackett's omission to claim the invention in the original patent and its action in reliance thereon.

Defendant will have it that in no case can a valid reissue be enforced against one who has acted substantially as it did, in reliance on the omission to claim in the original the invention covered by the reissue. It seems to think that there is no question as to such being the law. This, however, is not the attitude of the Supreme Court of the United States toward the matter as I gather from the recent case of Keller v. Adams-Campbell Co., 264 U. S. 314, 44 S. Ct. 356, 68 L. Ed. 705.

There a writ of certiorari had been granted, on the ground that the case involved the question of intervening rights. It was found, on further consideration, that it did not involve it, and the writ was thereupon dismissed. The question which it was thought was involved therein is thus put by the court:

"We granted certiorari upon the allegation of the petition, not denied by opposing counsel, that the sole question was whether one who makes and sells articles not covered by the claims of an original patent, but embraced by the enlarged claims of a subsequent valid reissue, applied for within seven months after the original was granted, has intervening rights such that he is not only immune from liability for what he has made and sold, but enjoys an irrevocable and permanent license to continue to make and sell without restriction."

That is the exact question we have here, except that the reissue was not applied for until one year, lacking a day, from the granting of the original patent. The fact that the court had granted the writ of certiorari of itself indicated that it thought that this question called for consideration by it. It said: "The question, if it were really before us, would be one sufficiently important therefore to justify our consideration of it on certiorari."

The reason why it thought the question was of such importance were thus stated: "The extent of the operation of the estoppel creating intervening rights in such a case [i. e., the case stated] presents a question not free from difficulty." And again in these words: "The views of the Circuit Court of Appeals on the general subject of the scope of intervening rights are not entirely easy to reconcile."

The court seems to have thought that the difficulty was not as to the existence of intervening rights in such case, but as to their extent. In support of its statement, as to the views of the Circuit Court of Appeals not being easy to reconcile, it cited a number of decisions of such courts including that of American Automotoneer Co. v. Porter, 232 F. 456, 146 C. C. A. 450, a decision of the Circuit Court of Appeals of this circuit, in which I had a part.

The value of this case from the Supreme Court is to be found in its recognition of the importance of the question as to intervening rights and of the fact that there was a degree of uncertainty hanging over it. It is a challenge to any one confronted with such a question to think it through, and see if it is not possible to reach a personal conviction in regard to it.

It is necessary—to avoid confusion—to keep distinctly in mind just what the question is. It is whether a valid reissue is enforceable against one, who between the granting of the original and the application for the reissue, makes and sells or makes and uses articles covered by the reissue, in reliance on the omission of the original to claim the invention. It has nothing to do with the validity of the reissue. It presupposes such validity. It concerns itself solely with its enforceability against such party.

In other words, it is whether the patentee is thereby estopped to assert the reissue against such party. There is never any occasion for one to assert a right against an invalid reissue. It is sufficient to render it unenforceable as to him that it is invalid—this whether he has such a right or not. As to

an invalid reissue every one stands on the same footing—he who asserts such a right and he who does not.

At the outset of the consideration of the question before me I should take note of the decision of the appellate court of this circuit, so referred to by the Supreme Court. There three patents, application for which were pending at the time of the granting of the original, were granted, between such granting and the application for the reissue. It was urged that by the reason of the granting of those three patents and the payment of the final fees during that interim the patentees therein had acquired intervening rights. The original was granted January 16, 1906, and the reissue was applied for March 18, 1907; i. e., one year, two months, and two days after the granting of the original.

The court thus expressed itself generally on the subject of intervening rights: "Defendant next urges that there were 'intervening rights' which prevented such a reissue, and relies upon Clements v. Odorless Co., supra, and similar cases, as showing that the three patents issued between the date of original issue and the date of application for reissue, sufficiently constitute or evidence those intervening rights which will bar a reissue. The reissue statute fixes no limit of time within which the application must be made; and does not specify that rights, accruing to the public or to individuals, after the first issue and before the application for reissue, shall affect the latter right. Miller v. Brass Co., 104 U. S. at page 350, 26 L. Ed. 783 (see Walker [4th Ed.] § 226), which first declared this additional condition, did not elaborate the foundation reason for so doing, but we think it must be assumed that the principle of estoppel (perhaps in favor of the public generally) is at the bottom of the rule.

"By the issue of a patent, the inventor dedicates to the public everything which he does not claim as his monopoly. Upon this dedication, the public has a right to rely, and if members of the public devote time and money to the manufacture of a device which the inventor has so dedicated, or to the devising, inventing and patenting of structures which embody such a feature, it may be presumed that this is done upon the faith of the dedication; and so the inventor, may not be permitted thereafter to enlarge his monopoly to the prejudice of these new rights—even though, except for them, the reissue would be permissible.

"The settled doctrine has come to be that from a delay of more than two years, and in the absence of any sufficient contrary evidence, these fatal intervening rights (public or private) will be presumed; in the presence of less delay, they must be proved. But see White v. Dunbar, 119 U. S. 47, 52, 7 S. Ct. 72, 30 L. Ed. 303, and Milloy Co. v. Thompson Co., 148 F. 843, 847, 78 C. C. A. 533."

It held that the mere granting of the three patents and payment of the final fees therefor were not sufficient to make out a case of intervening rights. It said: "There is no evidence that the inventors under any one of them manufactured, and so they do not seem to have done anything in reliance upon the apparent dedication made in the first patent, excepting merely that they paid their final fees. To this action they were measurably committed before the original issue of the patent in suit; and we cannot think it, of itself, enough to bar the reissue."

This would seem to imply that if the inventors referred to had manufactured under any one of the three patents, the holding would have been different. I take it that what was decided in this case and what was said or assumed in the opinion as to intervening rights are not in the way of my following my own conviction in the disposition of this case. I feel constrained to take exceptions to a number of things that were so said or assumed.

It was taken for granted that there is a "settled doctrine" as to intervening rights. As I view it, there is no such doctrine and never has been. The phrase itself is vague and indefinite. So far as there is any doctrine it is as to intervening right and not as to intervening rights. The question, in that case, was not as to intervening rights but as to intervening right. It was whether the defendant by the payment of the final fees in the interim between the granting of the original and the application for the reissue acquired the right to make and sell articles under its patents.

In the case of Keller v. Adams-Campbell Co. though the Supreme Court treated the question which it at first thought and later found not to be involved as one of intervening rights, such was not the question. It was as to intervening right. It was whether the defendant by the manufacture and sale, in such interim, of articles infringing the reissue acquired the right to continue in such business. So here the question is not as to intervening rights but as to intervening right. It is whether the defendant by manufacturing and using the two machines, in such

interim, acquired the right to use such machines and manufacture and use other such machines.

Nor, as I view it, is there any settled doctrine favoring the acquisition of such an intervening right in such cases. It is assumed, if not directly stated, that intervening rights may accrue to the public or to private individuals. As I view it, such rights do not accrue to either. Possibly in certain exceptional cases an intervening right may accrue to a private individual, never to the public. Possibly it may be true to say that the public did at one time have what may be properly termed intervening rights, but those rights were fulfilled and satisfied, and there has been no condition calling for their accruing since.

[1] Again the court treated the right there asserted as affecting the validity of the reissue. It spoke of "fatal intervening rights." What it meant by this was that they prevented or barred a reissue and if granted rendered it invalid. As I view it, an intervening right, if and when there may be such right, never affects the validity of the reissue. Its effect is confined solely to the enforceability of the reissue against the party having such right.

[2] Again, it was assumed that an intervening right may be acquired where the application for the reissue was made less than two years after the granting of the original. As I view it, conceding that an intervening right may be acquired in exceptional cases, it cannot be acquired unless more than two years has elapsed from such granting.

And finally it is stated that the case of Miller v. Bridgeport Brass Co. laid down the doctrine of intervening rights. The statement is that it "first declared it." As I read the decision in that case it did not lay down any doctrine either of intervening rights or intervening right. It did lay down a new doctrine. It will be seen that because it did this Walker called it a "celebrated case."

But the doctrine which it did lay down was neither one of these two. What it was will be stated later. That doctrine was based on the ground that as a rule, at least, there is no such thing as an intervening right in such cases. And in that it did so it negatived the existence generally of such a right.

The positions here taken may seem rather bold. That such is the case requires that they be made good. I begin with the last one as to the value of the decision in Miller v. Bridgeport Brass Co. If that is made good, it will be an easy matter to make good the other positions.

To do this necessitates a very detailed consideration of that case. The patent was for an improvement in lamps. It was for a combination of two domes without a chimney with other parts. It was granted October 16, 1860. There were two reissues; the first was granted in May, 1873, and the second in January, 1876. The suit was on the second claim of the second reissue. That claim was for a single dome with a chimney. The lower court dismissed the bill on the ground that it was not for the same invention.

The Supreme Court approved this position. It said, referring to the claim in suit: "It is not only obviously a different thing, but it is the very thing which the patentee professed to avoid and dispense with."

This really put an end to the case. There was nothing more to be said. But the court felt impelled to consider it, on the basis that the claim in suit was for the same invention, which I take to mean an invention disclosed by the original but not claimed therein. It held that the reissue was invalid on this basis. The thing of importance here is to determine the ground upon which it held it invalid on this basis.

It considered whether a reissue could be had merely to expand or enlarge the claim of the original; i. e., to claim an invention disclosed thereby but not claimed therein. The conclusion reached was that it could, though it came to such conclusion with some hesitation.

In this connection it surveyed the legislation on the subject of reissues. They were first provided for by the act of July, 1832 (4 Stat. 559). The act of 1793 (1 Stat. 318) as to original patents was then in force. Concerning it the court said that it was very comprehensive and exacting in requiring the applicant therefor to give in his specification "a clear and exact description of the invention." The act of 1832 it said was "carefully confined to cases where the patent was invalid or inoperative by reason of a failure to comply" with the requirement of the act of 1793 and "such failure was due to inadvertence, accident or mistake without any fraudulent or deceptive intention." The court then continued thus: "This being shown, a new patent with a correct specification was authorized to be issued for the same invention."

At that time the specification was entirely descriptive. It was not until the act of 1836 (5 Stat. 117) that it was required to be divided into the two parts of description and claims. This same act provided a new ground for reissue, to wit, that the patentee

had inadvertently claimed in his specification, as his own invention, more than he had a right to claim as new. The act of 1870 (16 Stat. 198), in force when the reissue in suit was granted, was a continuation of the former act. After this survey the court thus reasoned against the right to obtain a reissue, merely for the purpose of enlarging the claims:

"Now, in view of the fact that a reissue was authorized for the correction of mistakes in the specification before a formal claim was required to be made, and of the further fact that when such formal claim was required express power was given to grant a reissue for the purpose of making a claim more narrow than it was in the original, without any mention of a reissue for the purpose of making a claim broader than it was in the original, it is natural to conclude that the reissue of a patent for the latter purpose was not in the mind of Congress when it passed the laws in question. It was probably supposed that the patentee would never err in claiming too little."

It said further: "At all events, we think it is clear that it was not the special purpose of the legislation on this subject to authorize the surrender of patents for the purpose of reissuing them with broader and more comprehensive claims." It conceded, however, that such reissues were valid. It said: "Under the general terms of the law, such a reissue may be made where it clearly appears that an actual mistake has inadvertently been made." And again: "We do not deny that a claim may be enlarged in a reissue patent." But it countered thus: "Reissues for the enlargement of claims should be the exception and not the rule."

It is apparent, therefore, that the court did not hold the reissue, assuming it to be for the same invention, to be invalid on the ground that it was merely for an enlarged claim. It held it to be invalid on two other grounds. One was that the omission to claim the invention in the original patent was not inadvertent. The statute required that the omission to so claim should have been inadvertent, and not being so it was invalid under the statute.

The court said: "It is manifest on the face of the patent, when compared with the original, that the suggestion of inadvertence and mistake in the specification was a mere pretense." And again: "The pretense in this case that there was an inadvertence and oversight which had escaped the notice of the patentee for 15 years is too bald for human credence."

The other ground—which was the principal one—was the delay in applying for the reissue. It was held that it was such as to amount to laches. Because of such laches the patentee was not entitled to the reissue and it should be declared to be invalid. This the court held notwithstanding the statute prescribed no limit of time in which the application for a reissue should be made.

Mr. Justice Miller, who was on the bench at this time, did not agree with this holding, though he did not actually dissent. He did dissent in the later case of Mahn v. Harwood, 112 U. S. 354, 5 S. Ct. 174, 6 S. Ct. 451, 28 L. Ed. 665, where the same holding was repeated, and gave as his reason for not dissenting in the earlier case that the court went beyond the necessities of that case in dealing with the question. His idea was that no delay in applying for the reissue would affect its validity, because the statute did not require that the application be made in any particular time.

As I make it this holding of the court was based on three considerations. One is thus stated: "The mistake was so obvious as to be instantly discernible on opening the letters patent." And this: "And when, if a claim is too narrow—that is, if it does not contain all that the patentee is entitled to—the defect is apparent on the face of the patent, and can be discovered as soon as that document is taken out of its envelope and opened, there can be no valid excuse for delay in asking to have it corrected."

The second is thus stated: "But it must be remembered that the claim of a specific device or combination, and an omission to claim other devices or combinations apparent on the face of the patent, are, in law, a dedication to the public of that which is not claimed. It is a declaration that that which is not claimed is either not the patentee's invention, or, if his, he dedicates it to the public."

The third is thus stated: "Every independent inventor, every mechanic, every citizen, is affected by such delay, and by the issue of a new patent with a broader and more comprehensive claim. The granting of a reissue for such a purpose, after an unreasonable delay, is clearly an abuse of the power to grant reissues, and may justly be declared illegal and void. It will not do for the patentee to wait until other inventors have produced new forms of improvement, and, then, with the new light thus acquired, under pretense of inadvertence and mistake, apply for such an enlargement of his claim as to make it embrace these new forms. Such a process of expansion carried on indefinitely, without regard to lapse of time,

would operate most unjustly against the public, and is totally unauthorized by the law. In such a case, even he who has rights, and sleeps upon them, justly loses them."

And thus: "But in reference to reissues made for the purpose of enlarging the scope of the patent, the rule of laches should be strictly applied; and no one should be relieved who has slept upon his rights, and has thus led the public to rely on the implied disclaimer involved in the terms of the original patent. And when this is a matter apparent on the face of the instrument, upon a mere comparison of the original patent with the reissue, it is competent for the courts to decide whether the delay was unreasonable, and whether the reissue was therefore contrary to law and void."

The court spoke as if it was a matter of common knowledge that great harm had resulted from reissues for enlarged claims granted after unreasonable delay. It said: "But by a curious misapplication of the law it has come to be principally resorted to for the purpose of enlarging and expanding patent claims. And the evils which have grown from the practice have assumed large proportions. Patents have been so expanded and idealized, years after their first issue, that hundreds and thousands of mechanics and manufacturers, who had just reason to suppose that the field of action was open, have been obliged to discontinue their employments, or to pay an enormous tax for continuing them."

The existence of such a ground of invalidity of a reissue called for the formulation of some rule as to the time within which the application for the reissue must be made in order for it to be valid. Expressions were used which indicated that not much delay should be allowed. It was said that the reissue should be applied for "immediately," and again that it should be applied for "with all due diligence and speed." But a suggestion was made to the effect that if the application was made in two years it would be in time. The court said: "If two years' public enjoyment of an invention with the consent and allowance of the inventor is evidence of abandonment, and a bar to an application for a patent, a public disclaimer in the patent itself should be construed equally favorable to the public."

It is therefore this doctrine of laches which the Supreme Court first declared in this case and not any doctrine in regard to either intervening rights or intervening right. Walker on Patents (4th Ed.) § 226, thus puts the matter: "Miller v. Brass Co. is a celebrated case, which introduced a new doctrine into the patent laws of the United States. That doctrine is precisely this. The right to obtain a broadened reissue is lost by lapse of some time after the date of the original and before the application for that reissue."

It has become firmly established since the decision in that case that, if there has been a delay of as much as two years in applying for a reissue, it will, in the absence of special circumstances justifying the delay, be invalid on the ground of laches. Short of that time it will not be invalid. I know of no case where it has been held that the reissue is invalid if there has been a delay of less than two years.

So far as the matter of intervening rights or of intervening right is concerned, neither phrase is used in the opinion. The word "right" itself is not used, save in connection with the patentee, in speaking of his privilege to avail himself of the reissue statute. That it did not have to do with the question of intervening right in favor of a private individual, and established no doctrine in regard thereto, follows from the fact that no such intervening right was asserted in the case, and from the further fact that the question considered and determined therein was solely as to the validity of the reissue.

It was not as to its enforceability against such an one which would have presupposed its validity. A right never affects the validity of that against which it is asserted. It affects only its enforceability against the one who has the right. The fact that a reissue is unenforceable against one having an intervening right is no reason for its not being enforceable against one who does not have such right and hence against every one else except the one having such right. The principle of estoppel works in favor solely of one who has acted in reliance upon the action or nonaction of the party who is claimed to be estopped and no one else.

But not only does the case not recognize the possible existence of an intervening right in a private individual in such a case and put forth a doctrine on the subject, the doctrine which it did put forth, to wit, that of laches, was built upon the thought that in such cases, as a rule at least, there is and can be no intervening right in such an individual.

In speaking of the evils which had resulted from reissues where there had been an unreasonable delay the court said "that hundreds and thousands of mechanics and manufacturers, who had just reason to suppose that the field of action was open, have been obliged to discontinue their employments, or to pay an enormous tax for continuing

them." How did those evils come about, if those who had so acted, by reason thereof, acquired intervening rights against the reissues? It could only have come about because they had not acquired such rights. It was not suggested that such evils could have been or could be prevented by the assertion of an intervening right so acquired.

Again it was said: "Every independent inventor, every mechanic, every citizen, is affected by such delay, and by the issue of a new patent with a broader and more comprehensive claim." How could he have been so affected, if he acquired an intervening right which rendered the reissue unenforceable as to him? Still further it was said that to uphold such a reissue in case of laches "would operate most unjustly against the public." If an intervening right could be acquired which would render the reissue unenforceable as to the party having it, the reissue could not so operate. It would not be enforceable against any member of the public who had acquired such right. It could so operate only because any party who had acted on the faith of the dedication of the original patent would not acquire such right.

Furthermore, the implication is that if the patentee proceeds "immediately," or "with all due diligence and speed," or even within two years after the granting of the original patent to apply for the reissue, it will not only be valid, but enforceable against any one who before the application acted on the dedication of the original. There is not the slightest indication that, if the patentee so proceeds, the reissue will be rendered invalid because of such action or unenforceable as to such party. This is the reasoning by which I have felt driven to the conclusion that the decision in this case not only does not favor but negatives the acquisition of an intervening right by a private individual against a valid reissue, as a rule at least.

But, though nowhere in the opinion is any express recognition of rights in the public in the matter, the decision itself is to be accounted for on the ground of such rights, which, possibly, may be properly characterized as intervening rights. These rights were to have the law declared to be as it was in that case.

The object of law is to remove evils from social life; to put an end to conditions which produce injurious results. The evils and injurious results which called for the decision in that case are portrayed in the opinion. Under the terms of the reissue statute, the reissue might be obtained at any old time,

and be enforced against one who had acted on the dedication of the patent.

Possibly there was exaggeration in the portrayal of those evils and injurious results. There was not as much necessity to put forth the new doctrine of laches, in order to end them, as seems to have been thought. It would certainly be a most rare instance where a reissue applied for after the lapse of a long period of time—over 15 years in that case—would not turn out to be invalid under the statute, because not for the same invention, but to lasso the defendant's device, which was the case there, or want of inadvertence. Possibly it was a case for an amendment to the statute, and the decision smacks somewhat of judicial legislation.

However this may be such rights as the public had in the matter were fulfilled and satisfied by the decision in that case, and there has been no occasion since for any one, asserting an intervening right against a valid reissue, to drag in the rights of the public to help him out and thereby confuse matters. Every case that has arisen since wherein a defendant asserted that a valid reissue should not be enforced against him, involved only a question of intervening right in his favor and the rights of the public were to no extent involved.

I proceed now to consider the other positions put forward in American Automotoneer Co. v. Porter, to which I took exception, and that in the reverse order of their statement. It is apparent from what has been said in the discussion of the case of Miller v. Bridgeport Brass Co. as to what is the ground for the exception to the assumption that an intervening right may be acquired where the application for the reissue is made in less than two years.

Though the decision did not clearly concede that there could be no laches, unless there has been the lapse of at least two years in the making of the application, this was well established by subsequent decisions. It is the implication of the decision that where there can be no laches there can be no intervening right. As there can be no laches short of two years, so no intervening right can be acquired short of that time.

Then as to the effect of the intervening right. It is and can be only to affect the enforceability of the reissue. It is and cannot be to affect the validity of the reissue. It presupposes the validity of the reissue. The principle upon which an intervening right can constitute a defense to a suit based on a reissue is that of estoppel. An estoppel

can be relied on only by the party who has been influenced in his action by the action or nonaction of the other party. No one else can rely on it.

If a reissue is invalid, every one can defend against it. Of course, the party asserting the intervening right can assert also invalidity of the reissue on other grounds, as for instance, not being for the same invention or want of inadvertence. But the defense of intervening right says that, even if wrong as to the invalidity of the reissue on such grounds the reissue is not enforceable as to the defendant because of intervening right.

Then, as to the assumption that intervening rights may accrue either to the public or to private individuals. It has not been possible for such rights to accrue to the public since the decision in Miller v. Bridgeport Brass Co. Such as they then were they were fulfilled and satisfied by that decision. It has never been so that such rights could accrue to a private individual. It is only an intervening right which could accrue to him.

And, finally, as to there being a settled doctrine of intervening rights. It is evident from what has already been said, if sound, that there is and never has been any such doctrine. Whether there is any doctrine of intervening right remains to be determined.

Such, then, is my response to the positions taken and assumed in American Automotoneer Co. v. Porter, on which defendant greatly relies. I come now to the case of Topliff v. Topliff, 145 U. S. 156, 12 S. Ct. 825, 36 L. Ed. 658, on certain expressions in the opinion on which defendant relies. In that case the original patent was granted December 19, 1871. There were two reissues. The first was granted April 9, 1872; i. e., within four months of the granting of the original. The application, therefore, must have been made not many days after such granting. The second was applied for a little more than a month after the granting of the first, though the reissue was not granted until March 28, 1876, nearly four years later.

There was, therefore, no question of laches in the case. The patentee had proceeded with due diligence and speed. The reissue was solely for the purpose of expanding or enlarging the claim of the original; i. e., for claiming what was disclosed by the original, but not claimed. And the only question in the case calling for decision was as to whether a reissue obtained merely for such purpose was valid. It was claimed that it was not.

I have noted that in the Miller v. Bridgeport Brass Co. Case it was grudgingly admitted that such a reissue is valid and in some later cases there were expressions which cast a doubt on the subject. This brought about the questioning of the validity of such a reissue which necessitated the decision of it in that case. It was held that such a reissue was valid.

Between the decision in the two cases there was an epidemic of reissue patent cases in the Supreme Court and that court in the latter case reviewed 17 of them. The result of that review was thus stated:

"From this summary of the authorities it may be regarded as the settled rule of this court that the power to reissue may be exercised when the patent is inoperative by reason of the fact that the specification as originally drawn was defective or insufficient, or the claims were narrower than the actual invention of the patentee, provided the error has arisen from inadvertence or mistake, and the patentee is guilty of no fraud or deception; but that such reissues are subject to the following qualifications:

"First. That it shall be for the same invention as the original patent, as such invention appears from the specification and claims of such original.

"Second. That due diligence must be exercised in discovering the mistake in the original patent, and that, if it be sought for the purpose of enlarging the claim, the lapse of two years will ordinarily, though not always, be treated as evidence of an abandonment of the new matter to the public to the same extent that a failure by the inventor to apply for a patent within two years from the public use or sale of his invention is regarded by the statute as conclusive evidence of an abandonment of the patent to the public.

"Third. That this court will not review the decision of the commissioner upon the question of inadvertence, accident or mistake, unless the matter is manifest from the record; but that the question whether the application was made within a reasonable time is, in most, if not all, such cases, a question of law for the court."

It is thus seen that there is nothing in what was decided, and, so far, in anything that was said in the opinion, favoring a doctrine of intervening right. The expressions in the opinion relied on by defendant are two in number:

First: "In view of the fact that the reissue was applied for as soon as the mistake was discovered, and before any rights in favor of third parties could be reasonably expected to have attached, or had in fact attached, we think this reissue is not open to

the objections which have proved fatal to so many since the case of Miller v. Bridgeport Brass Co., 104 U. S. 350, 26 L. Ed. 783, was decided."

Second: "In the large number of cases which have come up to this court since that of Mahn v. Harwood was decided, in which reissues have been held to be invalid, it will be found that the opinion of the court was put upon the ground, either that the patentee had been guilty of inexcusable laches, usually from 4 to 16 years, or that circumstances had occurred since the granting of the original patent which made the reissue operate harshly or unjustly to the defendant in the case."

In this last expression it is the statement that the court had had before it cases in which the reissue was held invalid on the ground that circumstances had occurred since the granting of the original patent which made the reissue operate harshly or unjustly to the defendant that is relied on. It will be noted that the statement is not that the reissue had been held unenforceable against the defendant, but that they were invalid.

Two of the cases thus referred to are no doubt the following, to wit: Parker & W. Co. v. Yale Clock Co., 123 U. S. 87, 8 S. Ct. 38, 31 L. Ed. 100; Coon v. Wilson, 113 U. S. 268, 5 S. Ct. 537, 28 L. Ed. 963, which belong to the 17 reviewed.

Commenting on Parker v. Yale Clock Co., the court said that there had been a delay of one year and eight months, but that it appeared that the improvements not covered by the original patent had been brought into use by others than the patentee before the reissue was applied for. And commenting on Coon v. Wilson, the court said that there the reissue was applied for only a little over three months after the original patent was granted, but that the patentee waited until the defendants produced their device and then applied for such enlarged claim so as to embrace this device which was not covered by the claim of the original patent and it was apparent from a comparison of the two patents that the application for a reissue was made merely to enlarge the scope of the original.

Concerning this case, Walker on Patents (4th Ed.) § 227, had this to say: "In one simple case, where adverse rights had intervened, a delay of 97 days was decided to have a fatal effect on such a reissue."

In both these cases the defendant had acted after the granting of the original patent and before the application for reissue was made. In Coon v. Wilson, the infring-

ing collar had been made and sold not quite a month before the application for the reissue. In Parker v. Yale Clock Co. the infringing clock had been made and sold six months before such application. In neither one of these cases did the defendant claim that the reissue was not enforceable against it because of such action on its part.

The claim was that the reissue was invalid, and that because it was not for the same invention. It was on this ground that each reissue was held invalid. There was no question of intervening right in either case. The decision would have been exactly the same, had no intervening action been taken on the part of the defendants.

The reissues were invalid, not only as to them, but as to every other person, because they were not for the same invention. That the fact that the defendants in these cases had so acted, respectively, was not essential and rendered the case no stronger that it would have been, had they not so acted appears from what was said by the Supreme Court in the case of White v. Dunbar, 119 U. S. 47, 7 S. Ct. 72, 30 L. Ed. 303.

It was there said: "We attach no importance to the fact that, between the date of the original patent and the application for the reissue, the patent to Pecor and Bartlett was granted. It is, indeed, quite apparent that the appellees applied for a reissue in consequence of that patent, and in order to prevent the canning of shrimps under it. The circumstance that other improvements and inventions, made after the issue of a patent, are often sought to be suppressed and appropriated by an unauthorized reissue, has sometimes been referred to for the purpose of illustrating the evil consequences of granting such reissues; but it adds nothing to their illegality. That is deduced from general principles of law as applied to the statutes authorizing reissues, and affecting the rights of the government and the public."

To the same effect is this statement of the appellate court of this circuit in the case of Milloy Electric Co. v. Thompson-Houston Electric Co., 148 F. 843-847, 78 C. C. A. 533, 537, to wit: "The rule [i. e., that a reissue will be invalid where there has been inexcusable delay in applying for it] does not rest upon the ground of an estoppel in favor of particular persons."

There is, therefore, nothing in the second of these two expressions quoted from Topliff v. Topliff favoring defendant's position. But main reliance is had on the first of the two. To the same effect is this

additional expression therein, to wit: "Under such circumstances, it would be manifestly unjust to deny him the benefit of a reissue to secure to him his actual invention, provided it is evident that there has been a mistake and he has been guilty of no want of reasonable diligence in discovering it, and no third persons have in the meantime acquired the right to manufacture or sell what he had failed to claim."

In the first of these two expressions relied on by defendant the court speaks of the right of third parties attaching and in this additional expression, which I have supplied, it speaks of third persons having in the meantime acquired the right to manufacture or sell what the patentee had failed to claim. This seemingly recognizes the possibility of such rights attaching and being acquired. I have an idea that it is these expressions which are largely responsible for the notion which is quite prevalent that there is such a thing as a doctrine of intervening rights, meaning thereby of intervening right; i. e., of the possibility of a private individual acquiring such a right.

At best these expressions are obiter. But, without more, it is not possible to form an opinion as to what was the court's exact thought on the subject. It is possible that it had in mind only cases where the reissues were invalid under the statute as not being for the same invention. In the second expression of the court in that case relied on by defendant it referred to cases where the reissues involved were invalid on this ground, but it stressed the fact that the reissues would operate harshly or unjustly to the defendant.

There certainly is nothing in these expressions, or anything said or held in that case, which would justify one in saying that, if there the defendant had made and sold the infringing article during the interval between the granting of the original and the application for the reissue, which did not exceed six months, the court would have held that the reissue, which was valid, would by reason thereof have been invalid, or that though valid, it would have been unenforceable as against the defendant. Indeed it is inconceivable that it would have so held.

There is still another decision of the Supreme Court which has to be considered in order to exhaust its deliverances which have a possible bearing on the question in hand. It is the decision in the case of Abercrombie & F. Co. v. Baldwin, 245 U. S. 198, 38 S. Ct. 104, 62 L. Ed. 240. There the original patent had been granted May 22, 1906. It was held valid, but not infringed, by the appellate court of the Seventh circuit April 23, 1912. On February 5, 1913, application for a reissue was made which was granted March 11, 1913.

Amongst other defenses set up to a suit on the reissue, it was alleged that the application therefor was not made until seven years after the original patent was granted, and right had accrued in the meantime to the defendants and to others. It would seem that the claim was, not that the reissue was invalid because of such delay, but it was unenforceable against the defendants because of such rights. If such was the case, this is the first case in the Supreme Court which considers the question of intervening right.

As to this defense the lower court said: "It will be remembered that this company entered the field with its lamp at a time, when the validity and scope of the Baldwin patent were still unquestioned and when, after some five years of capable effort, the Baldwin lamp had created an extensive market. The Justrite Company took its chances and in view of the necessities of the situation it is relieved of all accountability for the period prior to the granting of the reissue patent; but when the reissue was granted the Justrite Company again took its chances. By the reissuance of the patent, the patentee loses all in the way of an accounting under the original patent, but the dominant purpose of the reissue statute was to save to the inventor the future remaining after the reissue. I see nothing in the course of plaintiffs and defendants which would allow a court of equity to conclude that defendants are to be relieved because of intervening rights."

The Supreme Court approved this reasoning and holding.

In the Keller Case the Supreme Court had this to say about this decision, to wit: "In Abercrombie & Fitch Co. v. Baldwin, 245 U. S. 198, 38 S. Ct. 104, 62 L. Ed. 240, a change, in the reissue, of the language of an original claim made it cover, not only a bent pipe, as shown, but a straight pipe as well, where the substance of the invention included both, and it was held that the intervening rights of immunity of the infringer did not extend beyond the date of the reissue. It is insisted, however, that the Fitch Case was not one of an enlarged claim, or, at any rate that a reissue was unnecessary because the original claim would have sufficed."

Then followed the words heretofore quoted as to views of the Circuit Court of Ap-

peals not being entirely easy to reconcile. The distinction there urged was put forth by the appellate court of the ninth circuit in the case of Supreme Mfg. Corporation v. Security Mfg. Co., 299 F. 65, where it said: "In the latter case it was held that the reissue did not enlarge the original patent, and the court was of the opinion that the original claims were sufficient in their scope to include, under the doctrine of equivalents, the more explicit claims of the reissue. It is manifest that in such a case there could be no loss of rights by delay in applying for a reissue, and there could be no impediment by way of intervening rights; the original claim being found sufficient to protect the whole invention of the patentee."

Unless, then, the decision in this case is distinguishable on this ground, it is squarely against the doctrine of intervening rights relied on by defendant. The reissue was held valid notwithstanding the great lapse of time from the granting of the original to the application for the reissue. This could not have been on the ground that laches did not affect the validity of a reissue. There was no intention to depart from the law on that subject as settled by previous decisions. It could only have been on the ground that there was no laches in that case, and that therefore the reissue was valid. And it was held that it was valid against the defendant, notwithstanding the assertion of intervening right.

This review of the decision of the Supreme Court makes plain that an advocate of the doctrine of intervening right—i. e., that an intervening right can be acquired as against a valid reissue—can find no support thereof therein. On the contrary, the doctrine of laches, first laid down by it in Miller v. Bridgeport Brass Company and consistently adhered to by it thereafter, according to which a reissue, where there has been inexcusable delay in applying therefor, is invalid, is against the existence of any such doctrine, at least in the wide scope contended for by the defendant.

The defendant cites and relies on certain decisions of the lower federal courts as upholding the doctrine. They are the following, to wit: Autopiano Co. v. American Player Action Co., 222 F. 276, 138 C. C. A. 38; American Automotoneer Co. v. Porter, supra; Standard Brick v. Denison (C. C. A.) 285 F 108; Krauth v. Autographic Reg. Co. (D. C.) 285 F. 199; Supreme Mfg. Co. v. Security Mfg. Co., supra.

Before entering upon a consideration thereof and in order to appreciate them fully, the question before me should be considered on principle; i. e., irrespective of the decisions on the subject. For the time being I would pass from the atmosphere of authority to that of experience. That question is whether one who, in the interim between the granting of the original and the application for the reissue, makes and sells or makes and uses articles embodying an invention disclosed by the original and not claimed therein, but subsequently covered by the reissue, in reliance upon the omission of the original to claim it, the reissues being valid, acquires an intervening right; i. e., the right that the reissue shall not be enforced against him.

In so considering this question, it should be borne distinctly in mind that the question only arises where the reissue is valid. It does not and cannot arise where the reissue is invalid. There is no occasion for asserting an intervening right in the case of an invalid reissue. Such a reissue is unenforceable as to every one.

The position that in such a case such party acquires such a right is based upon two considerations. One is that the patentee by omitting to claim the invention dedicated it to the public. The other is that such party acted in reliance on such dedication. It follows from these two considerations that the patentee is estopped to enforce his valid reissue against such party.

But this is not a complete account of the transaction. To limit one's self to these two considerations in determining the existence of such intervening right is to shut one's eyes to another consideration that has an equal bearing with these two on the question; that is, the dedication may have been inadvertently made, and, if so, the patentee is entitled to a reissue.

The reissue statute is built upon the thought that in such a case the patentee ought to have the benefit of his invention. How readily such a dedication may come about inadvertently is thus set forth by the Supreme Court in Topliff v. Topliff:

"The specification and claims of a patent, particularly if the invention be at all complicated, constitute one of the most difficult legal instruments to draw with accuracy, and in view of the fact that valuable inventions are often placed in the hands of inexperienced persons to prepare such specifications and claims, it is no matter of surprise that the latter frequently fail to describe with requisite certainty the exact invention of the patentee, and err either in claiming that which the patentee had not in fact in-

vented, or in omitting some element which was a valuable or essential part of his actual invention."

One contemplating acting on such dedication, therefore, is chargeable with notice that the omission to claim the invention in the original may have been inadvertent and that the patentee may apply for a reissue. With such notice good faith on his part requires that he should not act in reliance on such omission and consequent dedication until a reasonable time has elapsed for the making of such application.

It would seem that, in view of the rule laid down by the Supreme Court as to what is a reasonable time, he should wait at least two years. If he desires to act sooner, he can assure himself by inquiring of the patentee as to his purpose in the premises, though perhaps in this commercial age, characterized so much by searching for flaws in another's rights, it is hardly to be expected that any one will do this. Particularly, should such party wait, if the invention is clearly disclosed by the original patent and the omission to claim it is reasonably to be accounted for by inadvertence.

Certainly in such a case it should be held that one who butts in, as it were, before the lapse of a reasonable time, takes his chances. Should the patentee within such time avail himself of his right to a reissue, such a party has no one to blame for the loss of his expenditure but himself. In such a case there is no reasonable ground for applying the principle of estoppel. The doctrine of laches, first declared in Miller v. Bridgeport Brass Co., is based upon this reasoning.

After the lapse of a reasonable time for an application for a reissue—which, as a general thing, is taken to be two years—the right to reissue is barred, and, if granted, is invalid. After the lapse of that time the public have the right to act upon the idea that there is no intention to apply for a reissue, and if there ever was such an intention it has been abandoned. Before the lapse of such time, it has no right to act upon such idea.

If a member thereof does act before the lapse of such time, and the patentee does not avail himself of his privilege within such time, he should not be disturbed. If, however, the patentee does avail himself thereof within such time, he should surrender. The reissue is valid, and it should be enforceable as to him.

I would submit that it is not possible to take exception to this presentation of the matter on principle. I come now to the decisions of the lower federal courts relied on by defendant. In only one of them was the claim of intervening right upheld as against a valid reissue. Another contains a dictum upholding defendant's contention. I have already dealt with the decision of the appellate court of this circuit in American Automotoneer Co. v. Porter. The matter actually decided in the case was simply that one who obtains a patent and pays the final fees, in the interim between the granting of another patent and the application for reissue, such patent having been applied for before the granting of such other patent, has no intervening right.

Whilst the court there committed itself to the doctrine of intervening rights in the quotation made from the opinion, it is apparent that there was confusion in its ideas. It conceived of intervening rights as belonging to the public as well as to private individuals and as affecting only the validity of the reissue. It was not perceived that they could only belong to private individuals and that they had no effect whatever on the validity of the reissue—that their only possible bearing was to render a valid reissue unenforceable as to the party asserting them.

Furthermore, as it read the case of Miller v. Bridgeport Brass Co., it declared, and that for the first time, the doctrine of intervening rights, when the doctrine which it did declare, and that for the first time, was that of laches, which doctrine impliedly negatives the doctrine of intervening rights, conceived as I have stated it; i. e., as existing only in favor of a private individual and rendering a valid reissue unenforceable as to such individual.

All that is relied on in connection with the case of Standard Brick Co. v. Denison is this statement in the opinion, to wit: "Under the statute it is permissible for a reissue patent to serve the purposes of remedying the omission of the original to describe with requisite certainty the patentee's invention, and of correcting the fault in the original in making the claims allowed narrower than the actual invention of the patentee where that invention was disclosed by the original patent, due diligence was exercised in discovering the mistake in the original and in applying for the reissue, and the reissue application was made before any third person acquired the right to do what the applicant failed to claim in his original application."

In support of this statement the court cited Topliff v. Topliff and American Automotoneer Co. v. Porter. What is said therein

on the subject of intervening right is subject to the same criticisms which I have made on the statements on that subject in those cases, and it has no greater value on the question before me than they have.

The case of Supreme Manufacturing Co. v. Security Manufacturing Co. was a decision of the appellate court of the Ninth Circuit. There the original was granted August 25, 1914, and the reissue was applied for January 26, 1920; i. e., 5 years and 5 months after the granting of the original. The reissue was held invalid on the ground of laches if not also on the ground that it was not for the same invention.

In the opinion occurs this statement: "The appellant here has intervening rights as against the reissue, for it has acquired the right to manufacture and sell that which Ellis failed to claim, and, having expended considerable sums of money in the manufacture of a device at a time when the original Ellis patent was as yet unsurrendered, it cannot be held to infringe the added claims of the reissue."

Inasmuch as in this case the reissue was invalid on the ground of laches, there was no question of intervening right in it, as I view that question, which, I maintain, is the only view upon which it has any significance. According to the view as heretofore stated, such a question can only arise in a case where the reissue is valid, and has relation solely as to the enforceability of the reissue as against the party asserting such right. The court cited in support of its statement these decisions: Ives v. Sargent, 119 U. S. 652, 7 S. Ct. 436, 30 L. Ed. 544; Autopiano Co. v. American Player Action Co., 222 F. 276, 138 C. C. A. 38; Diamond Drill Contracting Co. v. Mitchell (C. C. A.) 269 F. 261; Keller v. Adams-Campbell Co. (C. C. A.) 287 F. 838; Ashley v. Samuel C. Tatum Co. (D. C.) 240 F. 979.

The case of Keller v. Adams-Campbell Co. was a previous decision of the appellate court of that circuit and was the same case which was carried to the Supreme Court on writ of certiorari, on the ground that it involved the question of intervening right, just as I view it; i. e., as having to do with the enforceability of a valid reissue against one asserting such right and subsequently dismissed on the ground that it did not involve such question, which has heretofore been considered by me.

The other cases except Autopiano Co. v. American Player Action Co. and Ashley v. Samuel C. Tatum Co. did not involve any question of intervening right. Ashley v.

Samuel C. Tatum Co. will be dealt with later. That of Autopiano Co. v. American Player Action Co. will be dealt with now. It is the one of the five cited and relied on by defendant where the claim of intervening right was upheld as against a valid reissue.

It was a decision of the appellate court of the Second circuit. There the original was granted May 2, 1905. There were two reissues. The first was applied for April 1, 1911, and was granted August 15, 1911. It came about because of a decision of the appellate court of the Seventh circuit rendered March 15, 1911, upholding the patent, but holding it not infringed.

The second reissue was applied for in December, 1911, and was granted April 2, 1912. The first reissue surrendered all the claims of the original and substituted four new claims. It was because the surrender of the original claims was inadvertent that the second reissue was applied for and it contained the original claims, which had been dropped by the first reissue. In the interim between the granting of the first reissue August 15, 1911, and the application for the second in December, 1911, which was only a very short one, possibly four months, defendant began the manufacture and sale of the infringing articles. It had sold five of them.

It was held that the second reissue was valid, but that it was not enforceable as to the defendant on the ground that it had an intervening right. It was held that it was not enforceable not only as to the five articles which had been sold but also as to the business of manufacturing and selling such articles. This is an exceptional case. Here the patentee by his first reissue abandoned the claims of the original patent and surrendered them to the public. Nothing occurs to me to justify a doubt as to its soundness. No inference can be drawn from it as to what should be the rule in other cases not like it.

The case of Krauth v. Autographic Reg. Co. is a decision of the District Court of New Jersey. A claim of intervening right was asserted therein, but it was denied. There is, therefore, nothing in the decision itself which is of value to defendant. There is, however, a dictum in it which favors its contention. It is in these words:

"It has been established by many decisions that, when a person has an original patent of narrow and limited claims and secures a reissue with broad claims, covering a device not embraced within the original claims, the patentee will be estopped from

enforcing the broad claims against the defendant, who has spent large sums of money and built up a business between the original issue and the reissue of patent. Likewise, when the claims of his original patent are broad, and the patentee secures a reissue with narrow claims, from which the broad claims have been omitted, and then secures a second reissue, containing both the narrow and broad claims, he will be estopped from enforcing the broad claims of the second reissue against the defendant, who has between the reissue spent money and built up a business in the belief that the patentee had abandoned his broad claims to the public. In the first case, by not claiming them, he is held to have abandoned them."

The following cases are cited in support of this statement: Miller v. Brass Co., 104 U. S. 350, 26 L. Ed. 783; Mahn v. Harwood, 112 U. S. 354, 5 S. Ct. 174, 6 S. Ct. 451, 28 L. Ed. 665; Autopiano Co. v. Am. Player Action Co., 222 F. 276, 138 C. C. A. 38.; Ashley v. Tatum Co. (D. C.) 240 F. 979; Am. Automotoneer Co. v. Porter, 232 F. 456, 146 C. C. A. 450. The statement finds no support in Miller v. Brass Company.

The statement finds no support in Miller v. Brass Co. and Mahn v. Harwood. They have to do with the doctrine of laches, and not that of intervening right. On the grounds heretofore indicated they are impliedly against the soundness of the first of the two branches of this statement. The second branch finds support in Autopiano Co. v. American Player Action Co. I have therefore dealt with American Automotoneer Co. v. Porter. It remains to consider in some detail the case of Ashley v. Samuel C. Tatum Co., which was also referred to in support of the statement heretofore quoted from the opinion in the case of Supreme Mfg. Co. v. Security Mfg. Co. It is a decision of the District Court of the Southern District of New York. There the original patent was granted August 8, 1905. It was held valid and not infringed March 13, 1911. Thereafter, on January 13, 1913, a reissue was applied for, which was granted December 13, 1913.

The reissue, therefore, was applied for over seven years after the granting of the original. In the meantime—i. e., beginning July 6, 1909, nearly four years after the granting of the original—the defendant entered upon the business of manufacturing and selling the articles which infringed the reissue, and built up a business of some importance. It was held that the reissue was not invalid on the ground of laches, notwithstanding the great lapse of time from the granting of the original to the application for the reissue.

But it was held further that the reissue was not enforceable as against the defendant on the ground of intervening right. The decision in Autopiano Co. v. American Player Action Co. was cited in support of the decision. It is the decision in these two cases which may be said to support the first branch of the dictum in Krauth v. Autographic Reg. Co. It refers to many decisions upholding it, but my attention has been called to none others than these two. I have heretofore referred to the case of Autopiano Co. v. American Player Action Co. as an exceptional case.

That of Ashley v. S. C. Tatum Co. may be regarded also as an exceptional one. There the reissue was held valid, notwithstanding more than seven years had elapsed from the granting of the original before the reissue was applied for. This was because of the special circumstances of the case. The requirement that application for a reissue must be made within two years of the granting of the original, otherwise it will be held invalid on the ground of laches, is not an absolute requirement. The decisions which have laid it down concede that special circumstances may prolong the time in which application for reissue may be made without patentee being chargeable with laches.

It may be that in such a case where such special circumstances are not known, to a party, who, after the lapse of two years and before the making of the application, enters upon the manufacture and sale of the articles which infringe the reissue, acquires an intervening right and the reissue, though valid, is not enforceable against him. The decision in this case may be justified on this ground. If its justification is to be found in this circumstance, it is not an authority to support the position that one who so acts before the lapse of the two years has intervening right which is the case which we have here.

The result, then, of my consideration of the cases cited and relied on by defendant is that I find no authority supporting the position that a valid reissue applied for within two years after the granting of the original patent is not enforceable against one who, after the granting of the original and before the application for the reissue, manufactures and sells or manufactures and uses articles infringing the reissue on the ground that by reason of such action he has acquired an intervening right.

It is well to pause here and emphasize the fact that not a solitary authority has been called to my attention which upholds such position. Against it, to reiterate, is the implication of the decisions which hold that an application for a reissue may be barred by laches and that if it is granted it will be invalid on the ground thereof.

It remains to deal with the special facts of this case, and see if there is any room to hold that defendant has an intervening right against the reissue in suit because of which it should not be enforced against it.

In the first place, defendant built on the Tackett invention. It cost it no effort to conceive claim 10. It was apparent on the face of the original patent. All it had to do was to reach out and take it. Its effort was limited to devising a machine which would avoid the claims of the original patent. Tackett brought it that far. It had only to determine the next step.

Secondly, it not only had the benefit of Tackett's invention; it also had the benefit of the machine in use by plaintiff which embodied it. It devised its machine after a close inspection of plaintiff's machine whilst in operation in its plant. I find no evidence that this inspection was with plaintiff's consent. Nor do I find any evidence of Tackett's consent beyond the inspection first made when he was negotiating with defendant, which inspection had in view such negotiations only. There is no evidence that the subsequent inspections to devise a noninfringing machine was with his consent.

Thirdly, the omission to claim the invention in the original was on the face of things reasonably to be accounted for by inadvertence. One would at least surmise that that was how it came about, and conceive the possibility that on the patentee's attention being directed to the matter he would apply for a reissue.

Fourthly, though defendant was engaged in business in close proximity to Tackett and plaintiff, no effort was made to find out what was their intention and purpose in regard to this matter.

Fifthly, defendant was in a great hurry to get its machine constructed and in use as soon as it ascertained that plaintiff had acquired the patent. It is not open to claim that it did this in order to get in position to set up a claim of intervening right before an application for a reissue was made. It was no doubt for the purpose of preventing as much as possible injury to its business through the advantage which plaintiff had over it in the patented machine. But suppose his motive was to beat Tackett to it. Could it be claimed that there was any estoppel against Tackett asserting the reissue against defendant? Certainly not. And, if not, there should be no estoppel in any case short of the two years.

Sixthly, the reissue was applied for within a year lacking a day from the granting of the original. The application was made as soon as it was ascertained that the claim of noninfringement was set up. Possibly reliance had been had on the doctrine of equivalents to protect the inventions as claimed in the original.

[3] In view of these circumstances I am constrained to hold that the defendant has not acquired any intervening right as to the two machines which it has constructed and put in use or as to any other machines.

[4] The other defenses put forward by defendant remain to be disposed of. They are want of novelty, lack of invention, and noninfringement. They are the usual defenses in a patent suit. In considering them I lack background, atmosphere, point of view. I am not equipped with knowledge of the decisions of the courts dealing with such questions. A patent case is a rarity with me. If there are any apt decisions applicable to this case, counsel have not cited them, and the decisions dealing with such questions are too many for me to run them down.

But possibly all that is needed to handle the first and the last of these defenses is ability to detect essential resemblances and differences. But this calls for some familiarity with machines, and I lack this. So it is that I fear that here I am as likely to miss the truth as to hit it. In disposing of these questions it is essential, at the outset, to come to an understanding as to just what is the invention covered by claim 10 of the reissue.

In the title of the patent it is said to be for a "brick machine." In each of the claims it is called "a brick-treating machine." This is really what it is, as will appear as I proceed. The machine is made up of four parts, a brick press, a brick repress, a brick trimmer, and a conveyor. The brick press and the brick repress are "in spaced relation to each other," the brick trimmer is "arranged between said presses," and the conveyor is "interposed between said presses and extending from one of them to the other of them and spaced beneath and clear of the trimmer."

There is no limitation on either the trimmer or the conveyor, except as to their location. They are both located between the presses, and the conveyor is spaced beneath and clear of the trimmer. The descriptive

part of the specification discloses a particular form of a trimmer and also such a form of a conveyor, and these particular forms are covered by the other claims of the reissue. It may be taken, therefore, that claim 10 was intended to and does cover every form of a trimmer and every form of a conveyor.

The brick press is referred to in the descriptive part of the specification as "a brick-pressing machine," and the repress as "a brick-repressing machine." These two parts of the claim are conceived of as exactly the same. The wording of the claim might have been a brick press and another brick press.

The only difference between them is in their treatment. One presses for the first time; the other for a second time. Both are referred to in such descriptive part as "brick-pressing machines," and it is said of them that they "may be of any conventional type, and the inventor does not wish to be limited with respect to the details of the construction thereof. These here illustrated are of a well-known manufacture, and it is believed their construction and operation will be apparent without any elaborate explanation of their construction."

The presses referred to are those manufactured by Chambers, and owned and used by both plaintiff and defendant before the coming of the Tackett machine; one press alone being used to manufacture the finished brick, and also used by defendant in the two machines complained of. Possibly their use was limited to the manufacture of fire brick, though this does not appear. Whilst the claim puts no limitation on the presses called for, I take it that they are limited to presses which are essentially like the presses so used and referred to.

The press and repress each contains a mold, or set of molds, and possibly a plunger, which does the pressing. The mold, or set of molds, are a part of the press and repress, and always remain with them. The press receives and operates on inchoate bricks, formed by a preceding operation and fed into it. This is what happened when a single press was used in producing the finished brick. It is said in such descriptive part that the end of the machine at which the press is stationed "will be regarded as the front end," and that is so since "the brick to be pressed are fed in at that end."

When this operation is completed the inchoate bricks are removed from the press toward the trimmer. The machine subjects the inchoate bricks to three successive treatments, the first being that just described. It then trims them, and finally it presses them again. The remaining part of the machine, the conveyor, has nothing to do with the treatment of the inchoate bricks. Its function is to carry the bricks from one treatment to another. The specific form of a conveyor covered by claim 3 is a complicated one. It is difficult to understand and to describe. The necessities of this case do not require that I do either.

It in part pushes the inchoate bricks on a support and in part lifts, carries longitudinally, and deposits them on the support; the latter process being in order to allow the pushers to return to their starting points. It takes charge of the inchoate bricks from the time they are ready to be fed into the press, and keeps control of them until it delivers them to the repress, except when they are in charge of the press. Though complicated, this conveyor is efficient. It would seem to be the most efficient conveyor devisable.

The defendant's conveyor consists of three parts, a traveling belt, running from the press under the trimmer to the head of an incline, such incline, and the pushing or feeding apparatus of the repress. It is inferior to the Tackett conveyor. This is conceded. The defendant devised a conveyor which it preferred to this conveyor, but it gave it up because advised that it would infringe. This is my reason for thinking that Tackett's conveyor is likely the most efficient conveyor that can be devised. It is not unlikely that the form of its conveyor is what led defendant to adopt its form of a trimmer. Its machine would not operate with Tackett's trimmer. The conveying force of the belt was not sufficient to force the inchoate bricks under that kind of a trimmer. Hence it adopted the four-bladed revolving trimmer.

I have stated that, after the inchoate bricks are operated upon by the press, they are removed therefrom toward the trimmer. It is said by defendant: "It is quite true that in defendant's machine and in the Tackett machine the brick is removed from the first press before being conveyed under the trimmer to the repress, but there is absolutely no such limitation expressed in claim 10."

Though not expressed, it is inherent in the structure claimed. How else can the inchoate bricks be subjected to the trimming unless they are removed from the press toward the trimmer and are then moved thence under it. Furthermore, it is said in such descriptive part that the conveyor is

"for moving the bricks from the primary press into position to be acted on by the sizing device or trimmer and progressively to the secondary press." The claim is to be construed in the light of this statement.

The bricks are removed from the first press of defendant's machine and of Tackett's machine before being conveyed under the trimmer, because that is the only way in which they can be made to operate. It follows that, whilst the bricks are undergoing the trimming condition, they are in a naked condition. By this I mean they are not in molds, or in any other receptacle. The molds in which they are pressed by the press remain in the press and do not follow them to the trimmer. The inchoate bricks from start to finish are in a naked condition, except when in the molds of the presses.

I am now in position to deal with the three defenses now under consideration. I do not find it necessary to go into much detail in so doing. As to want of novelty, defendant relies on the disclosures made in four patents, to wit: Patents No. 8,284, to Isaac Greeg, August 5, 1851, for a brick-making machine; No. 163,494, to Andrew J. Hoyt, May 18, 1875, for improvement in brick machine; No. 168,564, to William L. Gregg, October 11, 1875, for improvement in brick machines; and No. 432,452, to George T. Jacobs, September 6, 1892, for brick machine.

There is no evidence that either of these machines was ever manufactured and put in use. It is old paper patents, therefore, which are relied on to make out the defense. It would seem that they had in view the manufacture of ordinary building brick, though there is nothing in them limiting them thereto. The desirability of the production of brick of accurate dimensions and uniform size seems to have been recognized, though not much was expressed on the subject. Each of them also embodied the idea of first pressing, then trimming (?) and finally repressing.

I am not sure that either machine had a press and repress, within the meaning of Tackett's conception. It would seem that in all but the Jacobs patent all that precedes the final pressing answered to the preceding operation, which produces the inchoate brick, to be fed into the press in the Tackett machine. That operation consists of first producing a column of clay, then cutting a block therefrom, which constitutes the inchoate brick to be fed into the press. If this is a true view of them, it cannot be said the machine of either one of them

treats an inchoate brick first by pressing it, then trimming it, and then repressing it.

The word "trimmer," or "trimming," is not in use in either patent, and neither seems to have the idea of trimming an inchoate brick. The Jacobs patent seems to have the idea of treating an inchoate brick from the start. There, however, though the inchoate brick is subjected to the operation of a knife, it does not seem that such operation was conceived to be a trimming of such brick. The instrument is called a "knife or scraper." It is said that in the movement of the mold containing the inchoate brick the "knife or scraper * * * is caused to pass over the mold" and "remove any clay that may adhere to the edge thereof or any surplus that may result from swelling of the partially pressed block of clay in the mold."

But, however this all may be, there is this radical difference between the Tackett machine and each of the machines covered by those old patents: What the Tackett machine treats is a naked inchoate brick, whereas they one and all treat such a brick, in so far as they treat it at all, whilst in a mold. This difference seems to me to affect the efficiency of the treatment in favor of the Tackett machine.

In it the press determines the length and breadth of the inchoate brick. It leaves the thickness undetermined. That is determined by the trimmer and the repress. Where the inchoate brick is in the mold, the trimming treatment is limited by the sides of the molds. But suffice it to say that there is this radical difference between the Tackett machine and those which are relied on as anticipating it: It treats inchoate bricks in a naked condition. They treat them, in so far as they treat them at all, clothed by molds.

In view of this I am constrained to hold that claim 10 was not anticipated by any of those old paper patents. In them I find no suggestion of the Tackett machine, or any suggestion which would lead to its conception. Nor can I make out that there was any lack of invention in its conception. It seems to me that it was of great merit. It is conceded that, as embodied in claim 3, it was new, called for an exercise of the inventive faculty, and was meritorious. But claim 10 was followed by claim 3. Without claim 10, there could have been no claim 3.

When Tackett took the matter up, a single Chambers brick press was in use by both plaintiff and defendant in the manufacture of finished fire brick. The brick lacked accuracy in dimension and uniformity in size. This was a serious defect, and so rec-

ognized. What he conceived was to use another of such presses and a trimmer between them, with a conveyor to carry the naked brick from the press under the trimmer to the brick press.

After this general conception, he advanced further and devised a particular kind of trimmer and a particular kind of conveyor, and thus brought into existence what is conceded to be the most efficient machine to do the work. I think that plaintiff, as his assignee, is entitled to the benefit of his invention, not only in its present form, but in its general form, on which the former is bottomed.

The only possible ground for claiming noninfringement is that defendant's conveyor is made up of three parts, to wit, the traveling belt, the incline, and the pushing or feeding apparatus of the repress. It is conceded that the incline is a conveyor, as well as the other two parts. The three parts together perform the one function of conveying the naked, inchoate brick from the press under the trimmer to the repress. It seems to me this is sufficient to sustain the claim of infringement.

The plaintiff is entitled to decree for an injunction and for an accounting after the granting of the reissue.